665 A.2d 723

Allyn E. KILSHEIMER

v.

DEWBERRY & DAVIS, et al.

CONTRACT CONSTRUCTION, INC.

v.

Ashley Lynn FAHY, A Minor, et al.

No. 61, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Oct. 2, 1995.

Reconsideration Granted in Part and Denied in Part Oct. 31, 1995.

Ralph L. Casale (Lawrence A. Katz and Tucker, Flyer & Lewis, P.C., on the brief, for appellant, Kilsheimer) Washington, DC, David B. Hamilton (Stephanie A. Baldanzi and Ober, Kaler, Grimes & Shriver, on the brief, for appellant, Contract Construction) Baltimore, for Appellants.

Bardyl R. Tirana of Washington, DC for appellee, Dewberry & Davis.

Jay M. Eisenberg (Ronald D. Jacobs and Weinberg & Jacobs, on the brief, for appellee, Fahy) Rockville, for Appellees.

Argued before FISCHER, HARRELL and HOLLANDER, JJ.

HOLLANDER, Judge.

In this appeal, we confront the proper interpretation of Maryland Rule 2–402(e)(3), which governs the award of fees to expert witnesses in regard to discovery. In particular, we consider two awards granted by the Circuit Court for Prince George's County in connection with a multiparty wrongful death action [1] instituted by appellees Ashley Fahy and the Estate of Glen Fahy (together, "the Fahys").

At a settlement conference with the court on July 6, 1994, the parties settled the underlying tort case. At that time, however, they were unable to agree on the amount of fees for two of the Fahys' experts. Consequently, they submitted

---

**1.** Although irrelevant to the instant appeal, we note that this case has already been appealed once. *See Contract Constr. Inc. v. Power Technology Ctr. Ltd. Partnership,* 100 Md.App. 173, 640 A.2d 251, *cert. denied,* 336 Md. 301, 648 A.2d 203 (1994).

their dispute to the circuit court. With respect to the first expert, appellant Allyn Kilsheimer, P.E., the court required appellee Dewberry & Davis ("D & D"), a defendant below, to pay only a small portion of the fees that Kilsheimer claimed. With respect to the second expert, Jerome M. Staller, Ph.D., the court required appellant Contract Construction, Inc. ("CCI"), another defendant below, to pay the full amount invoiced by Staller. From these orders, both Kilsheimer and CCI have appealed.[2]

## I. Issues Presented

CCI presents two questions for our consideration:

1.  Should Maryland adopt the decisional analysis of federal courts establishing guidelines for determining the reasonableness of expert fees in litigation in Maryland?

---

**2.** Rule 2–402(c) does not address the question of standing to raise an issue as to expert witness fees or the manner in which the rule may be invoked. We assume, although the rule does not so state, that a party challenging the fees requested by an expert may invoke the rule. The rule is also silent as to whether an expert *personally* may raise the issue of fees, or whether the expert must proceed through the party retaining the expert.

Of course, neither Kilsheimer nor Staller was a party to the underlying litigation. Staller did not attend any of the hearings below and did not retain his own attorney. Nor has he independently participated in this appeal. In contrast, Kilsheimer appeared at the hearing below, with his own attorney. For purposes of resolving Kilsheimer's expert witness fee, the court ordered entry of his counsel's appearance as "special co-counsel to the plaintiff." He has also noted his own appeal.

Concerning the court's order regarding Staller's fees, CCI clearly has standing to appeal as a party. With respect to the court's order pertaining to Kilsheimer, no one has contested Kilsheimer's standing, either below or before us. Generally, any issue not raised below is waived. Md.Rule 8–131(a). Standing, however, is an issue that we sometimes will address *nostra sponte*. *Comm'n on Human Relations v. Anne Arundel Co.*, 106 Md.App. 221, 664 A.2d 400 (1995).

As we have noted, CCI's appeal from the Staller fee award is not subject to an attack on grounds of standing. Since the issues raised in Kilsheimer's appeal essentially overlap those raised by CCI, we decline to address the issue of Kilsheimer's standing. *See Pressman v. Mayor & City Council of Baltimore*, 222 Md. 330, 334, 160 A.2d 379 (1960) (where standing was not challenged below and where some of the parties clearly have standing, question of whether other parties lack standing will not be considered on appeal).

2. Should an expert be prohibited from arbitrarily charging a discriminatory fee of $300 per hour for his deposition?

Kilsheimer presents a series of issues:

1. Whether [D & D] and Mr. Kilsheimer reached an enforceable agreement requiring [D & D] to pay Mr. Kilsheimer $350 per hour for time spent at his deposition and in responding to [D & D]'s discovery requests.

2. Whether [D & D] was estopped from refusing to pay Mr. Kilsheimer his normal hourly rate of $350 per hour for time spent at his deposition and in responding to [D & D]'s discovery requests.

3. Whether [D & D] was the cause of the extra expenses incurred and fees earned by Mr. Kilsheimer in connection with his expert testimony in this case.

4. Whether an adverse party can require another party's expert to review documents and conduct further study in connection with the expert's deposition and then refuse to pay the expert his normal rate for time spent at the deposition and in responding to such discovery.

5. Whether Maryland Rule 2–402(e)(3) normally requires a trial court to order a party deposing an adverse expert witness and requesting discovery from such expert, to pay such witness' normal hourly rate.

6. Whether an expert witness's initial fee arrangement with the party that retained him provides a proper or dispositive basis to determine the amount which an opposing party should pay the expert in connection with his deposition.

7. Whether the Circuit Court should have followed, or was required to follow, [the D.C. Superior Court]'s ruling and ordered [D & D] to pay Mr. Kilsheimer his normal rate of $350 per hour for part of the time he spent testifying at his deposition.

8. Whether, in a case where [D & D] deposed Mr. Kilsheimer for six days and requested him to review volumi-

nous documents, it was a fair and reasonable fee for Mr. Kilsheimer to be paid only $4,500.

Most of the parties' questions address different aspects of the same underlying query, *i.e.*, whether the circuit court abused its discretion in determining the fee awards. The court's awards were facially inconsistent with each other; the award for Staller resulted in the full payment that he sought, but Kilsheimer's request for payment was substantially cut. Yet the court did not explain why it determined that only Staller deserved his entire fee. In addition, some of the court's factual findings as to Kilsheimer were clearly erroneous, and we cannot determine whether the court relied on these facts in fashioning its awards.

In view of the patent inconsistency of the two fee awards, the paucity of factual findings, and some clearly erroneous factual findings, we conclude that the court's resolution of the fee disputes was arbitrary and constituted an abuse of discretion. Consequently, we shall vacate both orders and remand for reconsideration.

## II.   Factual Background

### A.   The Underlying Litigation

Glen Fahy was an employee of Criblock Retaining Walls, Inc. ("Criblock"), a construction subcontractor. Criblock had been retained by CCI, a general contractor, as part of a construction project. D & D, one of the architectural firms involved in the project, was responsible for designing, among other things, the retaining wall that Criblock was building. Glen Fahy was killed on March 8, 1990, when the retaining wall collapsed on him. Thereafter, the Fahys filed a wrongful death action on July 27, 1992 against the parties involved in the construction of the retaining wall, including both CCI and D & D.

On April 7, 1993, D & D served its "Expert Witness Interrogatory," pursuant to Rule 2–402(e)(1)(A), asking each party to identify any expert witness that the party expected would testify, the subject matter on which the expert would

testify, the substance and findings of the expert's opinions, and the grounds upon which any such opinions were based. The Interrogatory also requested production of any written reports prepared by such experts concerning the experts' opinions. In response, on May 20, 1993, the Fahys identified two experts: Kilsheimer, a structural engineer, who would testify about matters concerning the construction of the retaining wall; and Staller, an economist, who would testify concerning the damages suffered by the Fahys.

### B. Allyn Kilsheimer

D & D conducted Kilsheimer's deposition in six separate sessions held during a five-month period. The circumstances surrounding the deposition sessions are hotly disputed, with each side accusing the other of conducting discovery in an unnecessarily confrontational, dilatory, petty, and even unethical manner. Bearing this dispute in mind, we have gleaned the following factual summary from the various pleadings, the docket entries, and the deposition testimony and affidavits in the record, along with the few undisputed portions in the parties' briefs.

In October 1992, the Fahys retained Kilsheimer, who lives and works in the District of Columbia, as a consultant. In their retainer contract, the parties agreed that Kilsheimer would review the materials in the case and advise the Fahys, at a rate of $350 per hour, with a maximum "cap" of $2,500. The contract limited its applicability to services other than actual testimony; it provides that, in the event that Kilsheimer were required to testify for them in a deposition or at trial, he "would receive additional compensation."

On April 27, 1993, the court issued a scheduling order with respect to the underlying litigation, requiring the parties to initiate discovery by June 5, 1993 and to complete discovery by September 15, 1993. On August 31, 1993, the court entered an amended scheduling order, requiring discovery to be completed by December 17, 1993. By the close of discovery, the Fahys had not filed a supplemental response to D & D's Interrogatory, and no one had attempted to depose Kilsheimer.

On December 20, 1993, D & D filed a motion for summary judgment. The Fahys filed an opposition to the motion, attaching an affidavit from Kilsheimer, which, for the first time, contained an opinion essentially stating that D & D's negligence contributed to Glen Fahy's death. On January 19, 1994, the hearing date of the motion, D & D complained that, due to the Fahys' failure to reveal the substance of Kilsheimer's opinion until after discovery had closed, D & D had been deprived of a meaningful opportunity to conduct discovery. At the court's suggestion, D & D withdrew its motion for summary judgment and arranged to take Kilsheimer's deposition on February 17, 1994. Accordingly, on February 1, 1994, the court issued a second amended scheduling order, extending the date for completion of discovery until April 29, 1994.

The February 17, 1994 deposition was cancelled, apparently because Kilsheimer was working in another state on another matter. According to D & D, the Fahys indicated that the next available date for a deposition was April 8, 1994. Unable to agree on a date, on March 1, 1994, D & D petitioned the D.C. Superior Court to issue a subpoena *duces tecum* for a deposition on March 7, 1994. The subpoena, however, named KCE Structural Engineers, P.C., Kilsheimer's corporate employer, not Kilsheimer himself. Also, about that time, Kilsheimer was in the hospital, undergoing major surgery. Although Kilsheimer was never served with a subpoena for the anticipated deposition, the parties and Kilsheimer agreed to hold the deposition on March 10, 1994. On March 5, 1994, in confirmation of the agreement, counsel for the Fahys faxed a letter to counsel for D & D, stating in pertinent part as follows:

> As I advised you today, Mr. Kilsheimer's usual expert fees are $350 per hour or $3,000 per day for any waiting period. Accordingly, Mr. Kilsheimer's fees for the deposition set for Thursday is $350 per hour. An invoice will be sent to you following the testimony on March 10, 1994.

The same day, counsel for D & D responded by fax as follows:

> This is to acknowledge and concur with your letter of March 5. My list of questions will be general in nature and

will contemplate reasonable follow-up questions which I do not think either Allyn or you will find troublesome.

On March 10, 1994, soon after his surgery, Kilsheimer was deposed for about two hours, against medical advice, and while on pain medication. During the deposition, he indicated that he had not yet reviewed any of the documents produced by any of the defendants, and that his testimony was based on his memory of documents that he reviewed several months earlier. Although he had formed an opinion with respect to the causal connection between Glen Fahy's death and the acts and omissions of some of the parties, Kilsheimer had not yet formed any opinion with respect to the causal role of the actions of D & D and CCI. Apparently dissatisfied with the information Kilsheimer provided, D & D continued the deposition to April 8, 1994, the next mutually agreeable date. On March 31, 1994, Kilsheimer sent D & D an invoice for six hours of his time, at a rate of $350 per hour.

At the April 8 deposition, Kilsheimer indicated that he had not reviewed his files in preparation for the deposition. He had, however, reviewed about two-thirds of the documents that had by then been produced through discovery, which Kilsheimer described as a stack of paper about two-and-a-half feet tall. He revealed that, in his preliminary opinion, D & D's negligence contributed to Glen Fahy's death. He further explained that he had not previously formed any opinions because the documents provided to him were, until recently, inadequate. He also indicated that he had not known that some of the documents even existed until he saw them a week before the second deposition. Finally, Kilsheimer listed several documents he still needed to acquire and examine before he could give a final opinion. Again, D & D sought to continue the deposition. Although the Fahys apparently did not object to continuing the deposition, the parties did not immediately settle on a date.

By letter dated April 12, 1994, D & D returned Kilsheimer's invoice, which had been submitted after the March 10 deposition, and refused to pay anything. D & D relied on the fact

that, during the April 8 deposition, Kilsheimer had acknowledged that he had not charged the Fahys anything above the $2,500 cap specified in the retainer contract. Kilsheimer had also indicated that he had not arranged for any further payment from the Fahys, and that he expected his deposition fees to be paid by D & D. Consequently, in the April 12 letter, D & D claimed that if Kilsheimer was not charging the Fahys anything, D & D had no obligation either. As further grounds for refusing to pay, D & D claimed that Kilsheimer was not fully prepared for either deposition. D & D suggested that Kilsheimer should be "happy at accepting the status quo (*i.e.*, that he does not bill for his deposition time, consistent with his fee agreement)." D & D indicated that if Kilsheimer was not happy, the matter should be submitted to the court for resolution.

The Fahys, meanwhile, refused to consent to any date for the resumption of the deposition before May, 1994, because Kilsheimer was scheduled for more surgery on April 26, 1994. On April 13, 1994, D & D, apparently concerned with the looming discovery deadline of April 29, 1994, again asked the D.C. Superior Court to issue a subpoena *duces tecum* for Kilsheimer and hired process servers. D & D even threatened to hold the deposition in the hospital, if necessary. Upon further negotiation, Kilsheimer rescheduled his surgery for the preceding week, and the parties agreed to conduct the deposition for no more than four hours, at Kilsheimer's home, on April 25, 1994.

At the third deposition session, Kilsheimer for the first time offered his "final opinion" with respect to D & D's liability. His testimony differed considerably, however, with respect to certain matters he had discussed during the deposition of March 10, 1994. The parties agreed to resume Kilsheimer's deposition on May 19, 1994, planning to finish all depositions by June 1, 1994, the target date set by the circuit court for any hearings on any motions for summary judgment. Also, on April 29, 1994, the court, at the request of the parties, extended the deadline to June 17, 1994 for concluding expert witness discovery.

Meanwhile, on April 28, 1994, D & D filed a renewed motion for summary judgment. In their opposition, the Fahys attached another affidavit by Kilsheimer. It contained an explanation of D & D's causal role that significantly differed from his prior deposition testimony, but did not include any grounds for the opinion.

At an unspecified time in early May, 1994, Kilsheimer learned that he could not attend the next deposition, scheduled for May 19, 1994, because he needed to undergo further medical treatment on that date. The parties could not agree on another date near May 19, because both Kilsheimer and D & D's counsel had scheduling conflicts. Anticipating that D & D would again seek a subpoena, the Fahys petitioned the D.C. Superior Court for a protective order against the issuance of any further subpoenas. The Fahys also sought an order requiring D & D to pay all of Kilsheimer's fees accrued to date, at a rate of $350 per hour, plus expenses. The D.C. court agreed, in part, and ordered as follows:

IT APPEARING TO THIS COURT that the moving parties have shown good cause for the issuance of a protective order, it is hereby this the 16th day of May, 1994,

ORDERED, that the Joint Motion shall be, and hereby is, GRANTED and DENIED in part; and it is further

ORDERED, that Mr. Kilsheimer's deposition shall be held on May 18, 1994 from 9:30 a.m. to 5:00 p.m.[;]

ORDERED, that within five days from the date of this Order, Dewberry & Davis shall pay Mr. Kilsheimer his expert witness fees *at the rate of $350 per hour for his deposition on May 18, 1994;* and it is further

ORDERED, that Mr. Kilsheimer's deposition scheduled for May 19, 1994, shall not be held.

(Emphasis added).

Thereafter, the parties and Kilsheimer agreed to cancel the May 18 deposition and reschedule it to June 1 and 2, 1994. During these sessions, Kilsheimer again altered his final opinion with respect to D & D's causal role in the accident and disclaimed reliance on most of the documents and texts which

he had previously used. Instead, he relied on newly produced documents. The parties continued the deposition to June 28, 1994.

The circuit court heard argument on D & D's renewed motion for summary judgment on June 8, 1994. According to D & D, counsel for the Fahys made oral representations concerning further testimony not yet given by Kilsheimer. The transcript, however, is not in the record on appeal. In any event, the court denied the motion.

On June 28, 1994, less than three weeks before trial, Kilsheimer was again deposed. Based on two documents that he had not seen prior to this deposition, along with a third he had seen but had not considered important until just before the deposition, Kilsheimer no longer believed he could form a sufficiently definitive opinion without actually having a survey conducted of the construction site and having earth samples taken.

As we noted earlier, the parties settled the underlying tort claims on July 6, 1994 through negotiations conducted with the court. During the settlement conference, the parties specifically raised the issue of Kilsheimer's fees, but were unable to resolve their disputes. By the close of the case, Kilsheimer had spent about thirty hours in deposition and claimed to have spent another 125 hours preparing specifically for the depositions, for which he sought compensation at a rate of $350 per hour. He also claimed nearly $16,000 worth of expenses. Consequently, Kilsheimer insisted on payment in excess of $72,000. D & D offered to pay him $4,500, representing $150 per hour for his thirty hours of deposition time; Kilsheimer rejected the offer. Thereafter, D & D refused to pay anything at all, and further refused to execute the settlement documents until the issue of the fees was resolved.

On July 18, 1994, D & D filed a motion for a show cause order for adjudication of the fee issue. In it, D & D asked the court to order Kilsheimer to pay the entire amount of D & D's settlement obligation to the Fahys, plus all of D & D's attorneys' fees and expenses. On August 12, 1994, the Fahys

filed a motion to enforce the settlement agreement, independent of any issue generated by Kilsheimer's fees. The court heard both motions on September 13, 1994.

### C. Dr. Jerome Staller

In contrast to Kilsheimer's situation, the facts surrounding Staller's deposition testimony are essentially undisputed.

According to the Fahys, Staller charged them $175 per hour for consulting and pretrial work, and $300 per hour for testimony at depositions and trial. On March 28, 1994, CCI noted Staller's deposition for April 18, 1994. On April 6, 1994, the Fahys faxed a letter from Staller to CCI, in which Staller indicated that his standard fee was $300 per hour, "portal to portal" with a two-hour minimum, plus expenses. The letter asserted that fees were to be paid by check presented at the beginning of the deposition. CCI responded by letter, declining to agree to any specific terms prior to the deposition, and offering instead to pay a "reasonable fee" as required by Rule 2–402(e)(3). On April 18, 1994, Staller appeared for deposition, insisting that he would not proceed unless CCI first executed his fee agreement. After conferring with counsel for the Fahys, however, Staller agreed to testify and defer payment.

CCI later received Staller's invoice, dated April 20, 1994, in the amount of $1,572.38. The invoice billed two hours of travel time at $175 per hour, four hours of testimony at $300 per hour, and $22.38 for mileage, tolls, and parking. By letter dated May 12, 1994, CCI refused to pay the invoice. Instead, CCI tendered a check for $1050, as full payment for six hours of time at $150 per hour. Staller insisted on full payment.

On July 14, 1994, the Fahys moved to compel payment of the remaining $500 of Staller's fees, which CCI opposed. On August 24, 1994, without considering CCI's opposition and without holding a hearing, the circuit court granted the Fahys' motion. On September 6, 1994, CCI filed a motion for reconsideration, which the court agreed to consider on September 13, 1994, along with the issues concerning Kilsheimer's fees.

## D. The Circuit Court's Decision

On September 13, 1994, the court heard argument concerning both experts' fees. As to Kilsheimer's claim, the court asked whether anyone "wants to argue the position that Kilsheimer's fee should be more than $150 [per hour]." Kilsheimer, appearing through his own counsel, presented his version of the events, proffering that his claimed rate of $350 per hour was his standard fee in all cases. Kilsheimer characterized D & D's conduct as "terrorist tactics," "intimidating and bullying" in nature, and "without any merit." Further, Kilsheimer argued that D & D was bound by the parties' contract of March 5, 1994. Kilsheimer also claimed that the fee-rate question had been resolved by the D.C. Superior Court, when it ordered his compensation at a rate of $350 for the deposition initially scheduled for May 18, 1994. Finally, he sought attorneys' fees.

D & D acknowledged that Kilsheimer was deposed for some twenty-eight hours, and incurred two hours of travel time. But D & D complained about Kilsheimer's conduct, and described him as obstructively dilatory, unreasonably inflexible in rescheduling depositions, chronically unprepared, and so internally contradictory that much of the time was effectively wasted. While D & D acknowledged that it had agreed to a rate of $350 per hour prior to the first deposition, it claimed that the agreement was limited only to the first deposition. D & D also claimed that the $2,500 "cap" had been willfully concealed from D & D and, given that the Fahys had already paid Kilsheimer, he should be bound by that "cap." D & D also asserted that, as a matter of law, an expert is not entitled to payment for preparation time. Although D & D had proffered that one of its experts had previously charged $150 for similar work, and suggested that D & D would be willing to pay that rate to Kilsheimer, there is no *evidence* in the record regarding its basis for the $150 figure. Finally, D & D asserted that the D.C. court's order had no bearing on the proceedings because it expressly applied only to the deposition that the court ordered for *May 18, 1994* which, by mutual agreement, was rescheduled.

The court indicated that it would hold the matter *sub curia,* pending a review of Kilsheimer's deposition. The court concluded, however, that the question of Kilsheimer's fees was an issue wholly independent of D & D's obligation to abide by the settlement agreement. The court then ordered D & D to complete the settlement papers and pay the full amount of the settlement to the Fahys.[3] D & D immediately tendered a check for the settlement amount.

Turning to Staller's claim, the court indicated that, because it had not previously considered CCI's opposition, the court would "consider [the matter] from the beginning." CCI suggested that the court should follow a "seven point test," used by some federal courts, to determine whether an expert's fee is reasonable. Like D & D, CCI argued that $150 per hour was a "reasonable" rate but that $300 per hour was not. CCI characterized Staller's services as "boiler-plate," not "brain surgery," and asserted that an assistant had done the bulk of Staller's work. The Fahys countered that the various defense counsel in the case had used Staller for similar work on other cases and, each time, counsel had paid him his customary $300 per hour fee. As with Kilsheimer, the court held the matter *sub curia,* pending review of Staller's credentials and deposition testimony.

On September 15, 1994, the court issued two separate orders. The first, regarding Kilsheimer's fees, reads in full as follows:

The Court has heard the parties' arguments concerning the reasonable amount of an expert witness fee for Dr. Allyn Kilsheimer. The Court is persuaded that the defendant Dewberry and Davis and Dr. Kilsheimer *never reached a clear, certain and definite agreement concerning a method of compensation for Dr. Kilsheimer's deposition testimony.*

The Court is further persuaded that Dr. Kilsheimer's agreement with the plaintiff for compensation for his ser-

---

3. D & D has not contested this ruling.

vices *was capped at Two Thousand Five Hundred Dollars ($2,500)* and he was in fact paid only Two Thousand Five Hundred Dollars ($2,500) by the plaintiff.

The Court is further persuaded that the defendant Dewberry and Davis *was not the cause of the extra expenses Dr. Kilsheimer incurred.*

Accordingly, the Court is persuaded that Dr. Kilsheimer is entitled to a fair and reasonable fee of Four Thousand Five Hundred Dollars ($4,500).

(Emphasis added). The second order, regarding Staller's fees, provides in full as follows:

The Court has heard the parties' arguments concerning the reasonable amount of an expert witness fee for Dr. Jerome Staller. The Court is persuaded that a fair and reasonable fee for Dr. Staller is One Thousand Five Hundred Seventy–Two Dollars and Thirty–Eight Cents ($1,572.38).

Accordingly, Contract Construction, Inc.'s Motion for Reconsideration of Order to Compel Payment of Expert Witness Fees is DENIED.

The court orally granted judgment on the merits of the Fahys' claim. The docket entries reflect entry of judgment on September 21, 1994 in favor of the Fahys and against various defendants, although there is no written order to that effect. An order of satisfaction was filed on September 30, 1994.

### III. Discussion

### A. Standard of Review

■ The circuit court has broad discretion with respect to the resolution of discovery disputes. *Baltimore Transit Co. v. Mezzanotti,* 227 Md. 8, 13–14, 174 A.2d 768 (1961); *see also Bartholomee v. Casey,* 103 Md.App. 34, 48, 651 A.2d 908 (1994) (discretion with respect to exclusion of unproduced evidence). At issue here is the court's exercise of discretion with respect to Rule 2–402(e)(3), which states in pertinent part:

Unless manifest injustice would result, ... the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery....

Accordingly, we must review any award granted under this rule based on the abuse of discretion standard. With respect to the court's factual findings, we review those findings only to determine whether they are clearly erroneous. Md.Rule 8–131(c); *cf. Jenkins v. Cameron & Hornbostel,* 91 Md.App. 316, 324, 604 A.2d 506, *cert. denied,* 327 Md. 218, 608 A.2d 780 (1992) (attorney's bad faith during discovery, for purposes of awarding attorney's fees, is factual question).

### B. The Fee Awards

As is apparent from the court's orders, it made few findings of fact concerning Kilsheimer and no findings at all with respect to Staller. Staller was effectively awarded his entire fee, which means he received an hourly rate of $300. In fashioning Kilsheimer's lump sum award, however, the court slashed his bill and awarded only a portion of his request. As the court failed to make a finding of the number of hours for which Kilsheimer was entitled to compensation, we are left to assume, based on the court's comments, that it awarded Kilsheimer's fee at the rate of $150 per hour, for a total of thirty hours. Nevertheless, the record does not reveal any manifest reason why $150 per hour was a reasonable rate for him, other than that D & D was willing to pay it. Nor did the court address whether any out-of-pocket expenses were recompensable. Moreover, with respect to the court's implicit denial of Kilsheimer's request for fees for the time he spent preparing for the deposition sessions, the court failed to state whether it reached its decision in the exercise of discretion, or whether it denied Kilsheimer's request because it believed that such an award was precluded as a matter of law.

As to Kilsheimer, the court also erroneously found that "Dr. Kilsheimer's agreement with the plaintiff for compensation for his services was capped at Two Thousand Five Hundred Dollars ($2,500) and he was in fact paid only Two Thousand

Five Hundred Dollars ($2,500) by the plaintiff." In actuality, the contract between Kilsheimer and the Fahys limited the applicability of this "cap" to time spent consulting *prior* to depositions and trial; it specifically excluded time spent testifying. Additionally, the contract explicitly allowed that, in the event Kilsheimer had to testify, the Fahys would be liable for fees above the cap accrued because of time spent in depositions.

Further, the court erred in finding that D & D and Kilsheimer never reached a clear, certain and definite agreement concerning a method of compensation for Kilsheimer's deposition testimony. Even assuming the "agreement" between counsel did not constitute an enforceable contract (as claimed by D & D), the parties, by their own terms, reached an agreement.[4] As we have observed, on March 5, 1994, counsel for the Fahys faxed a letter to counsel for D & D, stating that Kilsheimer's usual expert fee was $350 per hour or $3,000 per day. In response, counsel for D & D said he "concur[red]." Moreover, at the hearing on September 13, 1994, counsel for D & D conceded as much. He said:

> We agreed on a March 10 deposition. We agreed that I would present the questions in advance, which I did. *Based upon the representation made to me at that time, that Mr. Kilsheimer was—had a fee of $350 an hour, I said, "Fine."* For two hours or three hours of a limited deposition, who cares? And we went forward with the deposition at that time.

(Emphasis added).

Based on the letters, along with the admission from counsel in court, the only possible factual conclusion to be drawn is that the parties did reach an hourly fee agreement of $350, at least with respect to the first deposition, even though D & D later sought to repudiate the agreement. The court did not indicate how, or to what extent, these factual findings affected

---

4. We express no opinion on the merits of Kilsheimer's argument that the parties's communications of March 5, 1994 constituted a legally enforceable contract.

its decision. Because we cannot speculate, we are left to conclude that the court relied on them, at least to some extent, in arriving at its fee award.

D & D argues that the court's findings were not clearly erroneous because of the "concealed" $2,500 cap, as well as Kilsheimer's chronic failure to prepare and his inability to give a final opinion. D & D does not contend that Kilsheimer or the Fahys' counsel made affirmative misrepresentations as to their fee agreement. Nor does D & D offer any support for its claim that either Kilsheimer or the Fahys had an affirmative duty to volunteer the terms of their fee agreement, in advance of a request for such particulars. *Cf. Nationwide Mut. Ins. Co. v. Voland,* 103 Md.App. 225, 234–38, 653 A.2d 484 (1995) (there is no general duty to disclose information during arms-length settlement negotiations; consequently, a party's ignorance of information, caused by the party's own failure to inquire, does not justify avoidance of settlement agreement). In any event, Kilsheimer's "concealment" is irrelevant because the agreement with the Fahys did not address Kilsheimer's time spent in deposition.

Concerning Kilsheimer's inability to reach a final opinion, that failure would be prime impeachment material if the case had gone to trial. Also, to the extent that Kilsheimer's lack of preparedness forced the parties to continue the deposition, his conduct would be relevant to the *amount* of the fees ultimately awarded, or the number of hours for which the court awarded payment. But it has no bearing whatsoever on whether the parties reached a fee agreement. Moreover, the award to Kilsheimer of a lump sum in an amount less than he sought, without any explanation, leaves us with only a guess about the number of hours for which Kilsheimer was to be paid, and the rate of pay that the court determined was reasonable.

Turning to the order regarding Staller's fees, we acknowledge that an examination of the order, in isolation, reveals no facially apparent deficiencies. Moreover, the source for the amount of the court's award is readily apparent from the

record, even though the court made no findings of fact. Perhaps, had it been the only order on appeal, we might have found no basis for questioning its reasonableness. But the posture of this appeal, which places the two awards side by side, has brought the arbitrary nature of both awards sharply into focus: Staller's award is inconsistent with the denial of Kilsheimer's request, the inconsistency is not explained, and it is not supported by reasons obvious from context.

We conclude that the court's failure to make adequate factual findings for either fee award, and its failure to disclose the reasons why its awards were reasonable, are legally fatal. We find support for our view from three other contexts in which trial courts are asked to assess a "reasonable" fee against a party. First, where appropriate, the court must determine a "reasonable" attorney's fee in alimony cases under Md.Code Ann., Fam.Law Art. § 11–110 (1991). Second, while attorney's fees are not ordinarily recoverable in litigation, "there exists a well established exception to that rule which permits an award of attorneys' fees ... based upon a contract between the parties." *Maxima Corp. v. Cystic Fibrosis*, 81 Md.App. 602, 622, 568 A.2d 1170 (1990). Third, the court may assess attorney's fees under Rule 1–341, when a party or attorney has proceeded in bad faith. We recognize that the policies undergirding these situations are not the same as those relating to Rule 2–402(e)(3), and all of the factors are not necessarily relevant to an award of expert witness fees. Nevertheless, some of the principles applicable in these other fee situations are helpful here.

## 1. Alimony

Under Fam.Law Art. § 11–110(b), any party in an alimony proceeding may request, and the court may award, "an amount for the reasonable and necessary expense of prosecuting or defending the proceeding."[5] Any award under

---

**5.** In addition to any other factor, the court must, before making any such award, consider the financial resources and needs of each party,

§ 11–110 is reviewed on appeal only for abuse of discretion. *Odunukwe v. Odunukwe,* 98 Md.App. 273, 287, 633 A.2d 418 (1993); *Davis v. Davis,* 97 Md.App. 1, 25, 627 A.2d 17 (1993), *aff'd.,* 335 Md. 699, 646 A.2d 365 (1994).

> In determining the amount for a reasonable counsel fee, the ordinary factors of labor, skill, time and benefit ... must be taken into account. While time is one of the applicable factors, the record need not contain evidence specifically delineating the number of hours spent by counsel. Because the record itself discloses the nature of the proceedings, it is some evidence of the extent of the attorney's efforts. Given this evidence, the chancellor may rely upon his own knowledge and experience in appraising the value of an attorney's services.

*Foster v. Foster,* 33 Md.App. 73, 77, 364 A.2d 65, *cert. denied,* 278 Md. 722 (1976). *See also Strawhorn v. Strawhorn,* 49 Md.App. 649, 659, 435 A.2d 466 (1981), *vacated,* 294 Md. 322, 450 A.2d 490, *affd. in part, rev'd. in part on other grounds,* 52 Md.App. 614, 451 A.2d 665 (1982).

Our discussion in the case of *Randolph v. Randolph,* 67 Md.App. 577, 508 A.2d 996 (1986), is particularly applicable here. In *Randolph,* the wife petitioned for an award of fees for the services rendered by multiple attorneys. In support, she submitted bills in excess of $34,000. Over objection, the chancellor admitted the bills into evidence, merely to show "prima facie that there [is] a bill outstanding in that amount." *Id.,* at 588, 508 A.2d 996. The court's comments, however, reflected serious doubt that the huge legal fees that were billed were reasonable or proper. Nevertheless, without explanation, and without having received any further evidence, the court awarded $30,000. On appeal, we reversed the court's order on other grounds, without considering whether this award constituted an abuse of discretion. Nonetheless, we observed:

---

as well as whether there was "substantial justification for prosecuting or defending the proceeding." *Id.* § 11–110(c).

We are troubled by the absence of evidence to support the reasonableness of the award of attorneys' fees, particularly in view of the court's own comments. Of course, a trial judge may make an award of counsel fees without such evidence on the basis of his own knowledge, gleaned from the record and his observations at trial, of the attorney's services and their value. If he does so, however, particularly in a case in which bills for legal services are challenged, *he ought to state the basis for his decision so it can be reviewed, if necessary, on appeal.*

*Id.,* at 589, 508 A.2d 996 (citation omitted; emphasis added).

### 2. Attorney's Fees Under Contracts

In *Maxima Corp. v. 6933 Arlington Development Ltd. Partnership,* 100 Md.App. 441, 641 A.2d 977 (1994), we reversed the trial court's award of attorneys' fees that was founded on a contract between the parties. Writing for the Court, Judge Davis noted, *inter alia,* that "the record fails to disclose sufficiently why the amount awarded was reasonable." *Id.,* at 451, 641 A.2d 977. Of particular interest here, the Court also observed that "a fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client." *Id.,* at 453, 641 A.2d 977. After presentation of evidence in support of a claim for attorneys' fees, the Court recognized that "the trial court must still evaluate the reasonableness of the fees." *Id.,* at 454, 641 A.2d 977.

### 3. Attorney's Fees For Unjustified Proceedings

Consideration of cases awarding attorneys' fees under Rule 1–341 is also useful. Under this rule,

if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party ... to pay the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

■ An award of "sanctions" under this rule is compensatory, not punitive, in nature. "[The rule] does not provide for a monetary award to punish a party that misbehaves. The rule's purpose is to put the wronged party in the same position as if the offending conduct had not occurred." *Major v. First Va. Bank,* 97 Md.App. 520, 530, 631 A.2d 127 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994). Even so, the remedy is "extraordinary," and is strictly limited to correcting bad faith conduct during litigation that lacks substantial justification. *Id. See also Miller v. Miller,* 70 Md.App. 1, 12–13, 519 A.2d 1298 (1987) (even though there was a basis for *some* award, an award for *all* fees charged throughout the litigation was arbitrary and an abuse of discretion).

The case of *Beery v. Md. Medical Laboratory, Inc.,* 89 Md.App. 81, 597 A.2d 516 (1991), *cert. denied,* 325 Md. 329, 600 A.2d 850 (1992) is relevant here. In *Beery,* the trial court originally granted a lump sum award to a party pursuant to the rule, although only a portion of the litigation was maintained in bad faith and without justification. But the court failed to make any factual findings. On the first (unreported) appeal, we vacated the order, due to the court's failure to make specific findings "necessary to support such an award." *Id.,* 89 Md.App. at 99, 597 A.2d 516. On remand, the court found that there was bad faith and no substantial justification with respect to three of the four counts in the plaintiff's complaint, but proceeded, without explanation, to award $12,-000 in attorney's fees. The only evidence of actual expenses was a bill for $36,000; appellee's counsel requested an award of about three-quarters of it. On the second appeal, we said:

> It is perfectly obvious from the record in this case that the $12,000.00 awarded appellee had no relationship to the amount of expenses actually incurred in defending the second, third, and fourth counts. That the court made no findings with respect to that requirement is understandable. Appellee's counsel did not attempt to present any evidence that would have enabled the court to make such findings, and there was at the time no case law indicating any need to do so. What appellee's counsel did to apportion the total

bill for legal fees, arbitrarily assigning about one-fourth to each count, simply will not suffice. Hardly any time would have been required to demonstrate that there was no justification for Count IV.... [W]e must vacate the judgment for attorney's fees and remand for a determination of what part of appellee's claimed expenses and attorney's fees are specifically attributable to the unjustified maintenance of meritless claims, provided counsel can establish what portions of their fees are specifically attributable to that conduct.

*Id.,* 89 Md.App. at 101, 597 A.2d 516.

Our conclusion that the court must make adequate factual findings and set forth its reasons in support of its determination of each fee award necessarily leads us to consider the question of the factors that the court must apply to its factual conclusions. We shall, therefore, explore the relationship between the facts of a given case and the determination of a "reasonable" fee award, as mandated by Rule 2–402(e)(3). We express no opinion, however, on the merits of the particular fee awards.

## C. A "Reasonable" Fee Award

### 1. *Factors To Be Considered*

█ We have not uncovered any Maryland cases specifically addressing the factors that the trial court should consider regarding the award of expert fees.[6] To the extent a federal rule of procedure mirrors the language in its Maryland counterpart, cases interpreting the federal version are persuasive.

---

**6.** The few cases that have considered the question of expert witness fees can probably be explained by the fact that the litigants usually resolve these types of disputes without court intervention. We certainly encourage that practice. Moreover, we wish to be clear that this opinion does not stand for the proposition that, after full and final settlement of the underlying claims, the parties or their experts are entitled to raise these fee disputes with the court. We reiterate that, in this case, the expert fee disputes were initially addressed *during* the settlement conference with the court.

*Bartell v. Bartell,* 278 Md. 12, 18, 357 A.2d 343 (1976).[7] Rule 2–402(e)(3) was derived in part from Fed.R.Civ.P. 26(b)(4)(C). PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY 259 (2d ed. 1992). Like the equivalent Maryland Rule, Fed.R.Civ.P. 26(b)(4)(C) (1992)[8] stated, in pertinent part, as follows:

> Unless manifest injustice would result, . . . the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision. . . . .

The purpose of Federal Rule 26(b)(4)(C) is well settled. Its goal "is to compensate experts for their time in participating in litigation and to prevent one party from unfairly obtaining the benefit of the opposing party's expert work free from cost." *Hurst v. U.S.,* 123 F.R.D. 319, 321 (D.S.D.1988), *aff'd. in part, rev'd. in part on other grounds,* 882 F.2d 306 (1989). Under that policy, a party seeking disclosure of the expert's opinion is only liable for the expert's fees if the party requires the expert to submit to a deposition. *See* Charles A. Wright, Arthur R. Miller, & Richard L. MARCUS, 8 FED. PRACTICE & PROCEDURE: CIVIL 2D § 2034, at 469 (1994) ("WRIGHT & MIL-LER"). A party seeking discovery of an expert's opinion may, on occasion, face the problem of either paying an exorbitant expert fee or foregoing needed discovery. The rule, however, permits review by the court, which helps to avoid such abuse. *See* WRIGHT & MILLER, § 2034, at 469 (discussing problems). What the federal district court observed in *Jochims v. Isuzu Motors, Ltd.,* 141 F.R.D. 493 (S.D.Iowa 1992) is pertinent to this point:

---

7.  CCI also directs us to the Local Rules of the U.S. District Court for the District of Maryland, L.R. 104.11(a) (1995). Under this rule, an expert cannot charge the opposing party a fee for a deposition at an hourly rate that exceeds the rate that the expert charges for the preparation of his or her report. Maryland Rule 2–402(e) has no such limitation, however.

8.  Effective December 1, 1993, Fed.R.Civ.P. 26(a)(2) was significantly amended and no longer mirrors Md.Rule 2–402(e)(3). Accordingly, all citations to Fed.R.Civ.P. 26 refer to the 1992 version.

Continuing escalation of expert witness fees and the all too frequent attitude of experts that their fees should be set at the maximum-the-traffic-will-bear is of great concern. The escalating cost of civil litigation runs the grave risk of placing redress in the federal courts beyond the reach of all but the most affluent. Judge Selya eloquently stated this position nearly seven years ago in *Anthony* [*v. Abbott Lab.*, 106 F.R.D. 461, 465 (D.R.I.1985) ], when he stated:

> Our citizens' access to justice, which is at the core of our constitutional system of government, is under serious siege. Obtaining justice in this modern era costs too much. The courts are among our most treasured institutions. And, if they are to remain strong and viable, they cannot sit idly by in the face of attempts to loot the system. To be sure, expert witness fees are but the tip of an immense iceberg. But, the skyrocketing costs of litigation have not sprung full-blown from nowhere. Those costs are made up of bits and pieces, and relaxation of standards of fairness in one instance threatens further escalation across the board. The effective administration of justice depends, in significant part, on the maintenance and enforcement of a reasoned cost/benefit vigil by the judiciary.

*Id.*, at 497 (footnote omitted).

Even in the federal arena, there is scant authority considering the reasonableness of expert fee awards. *Hose v. Chicago & N.W. Transportation Co.*, 154 F.R.D. 222, 224 (S.D.Iowa 1994); WRIGHT & MILLER, § 2034, at 470. To the extent the issue has been considered, two cases, *Goldwater v. Postmaster Gen'l of the United States*, 136 F.R.D. 337 (D.Conn.1991) and *Jochims*, 141 F.R.D. 493, have provided a framework that has generally been accepted by other courts.

In *Goldwater*, the district court believed that the application of a six-point test would help resolve the question of what fee is "reasonable." Specifically, the court focused on the following factors:

(1) the witness's area of expertise; (2) the education and training that is required to provide the expert insight which is sought; (3) the prevailing rates of other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26.

136 F.R.D. at 340. Applying these factors, the court felt, for example, that an expert witness having both a medical and a law degree but testifying about a matter requiring only a medical degree should not be entitled to charge more than an expert with just a medical degree. *Id.* Likewise, the court believed that the evasive and argumentative nature of an expert's answers was relevant to whether the expert deserved a fee more than twice that of comparable experts. *Id.*

In *Jochims,* the district court agreed with the general approach taken by the *Goldwater* court, but disagreed as to the precise list of factors that courts should consider. In particular, the *Jochims* court believed "that the cost of living in a particular geographic area is [not] directly relevant to a reasonable fee and, in any event, this factor is frequently ... calibrated into prevailing market rates." 141 F.R.D. at 496. Instead, the court suggested consideration of two other factors: "(1) the fee actually being charged to the party who retained the expert; and (2) fees traditionally charged by the expert on related matters." *Id.* Applying its "seven-point" test, the court was concerned that the expert in question had charged the opposing party twice as much as he charged the party who had retained him, and that the expert did not receive the high rate for any other services he performed.

Following *Jochims,* the few courts considering the issue have adopted the "seven-point" test. *See, e.g., Hose, supra, Dominguez v. Syntex Laboratories, Inc.,* 149 F.R.D. 158 (S.D.Ind.), *upon reconsideration,* 149 F.R.D. 166 (S.D.Ind. 1993); *Pierce v. Nelson,* 509 N.W.2d 471 (Iowa 1993). We, too, find the analysis of *Goldwater* and *Jochims* persuasive; the factors discussed in *Goldwater* and *Jochims* are certainly

useful as guideposts, and trial courts should consider them in making such awards.

■ Both *Goldwater* and *Jochims* carefully allowed for the possibility that an unforeseen fact may be important. They also recognized that not every factor mentioned in those cases deserves significant or equal consideration in every case. Thus, what fee is "reasonable" in a given case necessarily turns on the particular facts of each case. *See also Dominguez*, 149 F.R.D. at 165–66 (lacking proper record of evidence to evaluate the various factors, court ordered evidentiary hearing).

It is noteworthy that the factors that the *Goldwater* and *Jochims* courts considered are comparable to several of the factors delineated in Md.Rule 1.5 of the Rules of Professional Conduct, which governs fees that attorneys may charge. In *Maxima*, the Court observed that these factors may be considered by a trial court when awarding reasonable attorneys' fees pursuant to contractual provisions. *Maxima*, 100 Md. App. at 454, 641 A.2d 977. Md.Rule 1.5(a) provides, in pertinent part:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

\* \* \* \* \* \*

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

\* \* \* \* \* \*

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services.

The application to the instant case of some of the considerations outlined in *Goldwater* and *Jochims* demonstrates the need for careful evaluation of the evidence and resolution of

disputed facts. For example, with respect to Kilsheimer, D & D contends that Kilsheimer's lengthy delays in offering any opinions (including the total failure to offer a final opinion), his lack of preparation, his contradictory testimony, and his particular credentials as a structural engineer did not justify a fee of $350 per hour. Kilsheimer counters that $350 was his usual rate for time spent testifying, that D & D, knowing of his fee, agreed to it, that any unpreparedness was caused by D & D's slow production of important documents combined with Kilsheimer's inability to read them due to his ill health, all of which justify his full fee. He maintains, too, that he is entitled to reimbursement for his out-of-pocket expenses. In addition, the amount Kilsheimer actually charged the Fahys, the amount the Fahys actually paid, and the extent to which the parties agreed about Kilsheimer's fees on March 5, 1994, are all relevant to the determination of a reasonable fee. The court should also determine whether the Order issued by the D.C. Superior Court is probative of the amount of a reasonable fee.

Similarly, with respect to Staller, the facts do not point to a single resolution. CCI complains that Staller did not offer any services requiring his expert skills, that his less-qualified assistant did the bulk of the work, and that he charged the Fahys no more than $175 per hour of work. The Fahys, in contrast, allege that CCI's complaints are disingenuous, given the prior relationship between CCI's counsel and Staller.

While we cannot resolve these disputes, we recite them to observe that the evidence already in the record can support a wide range of discretionary awards. On remand, the court should take care to examine *all* the relevant facts in light of the guidelines that we have set forth.

We hasten to reiterate that the touchstone of any decision under Maryland Rule 2–402(e)(3) remains the discretion of the court, and not the recitation of any particular litany of factors. Indeed, although enunciated in an unrelated matter, the words

of the Court in *Aravanis v. Somerset County,* 339 Md. 644, 664 A.2d 888 (1995) are particularly apt here:

> It would be premature for us to propose, by this opinion, a precise formula or laundry list of factors to fit every case that will come before the courts. We can at this juncture only paint with a rather broad brush, identifying the required areas of consideration and the non-exclusive list of factors we have discussed, leaving to the trial judges in the first instance the weighing of factors appropriate to each individual case.

*Id.,* 339 Md. at 665, 664 A.2d at 898.

We do not mean to suggest, however, that, whenever the court faces a dispute with respect to expert witness fees, it must always conduct a mini-trial and issue lengthy, detailed findings of fact. But when, as here, the facts are hotly disputed, the court should address the evidence and the factual findings upon which it relies, and provide the reasoning behind its decision.

> To play fair, a trial judge relying upon discretionary powers should place on record the circumstances and factors that were crucial to his determination. He should spell out his reasons as well as he can so that counsel and the reviewing court will know and be in a position to evaluate the soundness of his decision. If the appellate court concludes that he considered inappropriate factors or that the range of his discretionary authority should be partially fenced by legal bounds, it will be in a position to do this intelligently.

M. Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 SYRACUSE L.REV., 635, 665–666 (1971).

### 2. Award For Preparation Time

■ The question of whether an expert should be awarded fees for the expert's time preparing for depositions has proven to be a divisive issue. *Hose,* 154 F.R.D. at 227 (collecting cases on each side of debate). On the one hand, "it is hard to deny that the deposition-preparation process, like the deposition itself, requires additional effort by the expert. . . ."

WRIGHT & MILLER, § 2034, at 471. Also, "compensation of an expert for time spent preparing for a deposition [may be] appropriate ... in a complex case where the expert's deposition has been repeatedly postponed over long periods by the seeking party causing the expert to repeatedly review voluminous documents." *Rhee v. Witco Chem. Corp.*, 126 F.R.D. 45, 47 (N.D.Ill.1989). Even those courts that do not generally award fees for preparation time permit it in extraordinary circumstances. WRIGHT & MILLER, § 2034, at 471 & nn. 16–17.

On the other hand, much of the work an expert may perform in preparation for a deposition may be work the expert has already done and, if the expert is planning to testify at trial, may also be work the expert has to do for his or her own client in order to prepare for trial. *Id.* Probably for this reason, L.R. 104.11(a) of the Local Rules of the U.S. District Court for the District of Maryland, expressly provides: "The fee charged by the expert for time spent preparing for the deposition shall be paid by the party designating the expert." Moreover, unlike a deposition (where the content of the expert's work and the time are independently recorded), there is no easy manner of verifying an expert's claims with respect to time and work spent in preparation.

In regard to this debate, the court's comments in *Hose* are helpful. There, the expert, who was also the physician treating the plaintiff, requested compensation for his time spent at deposition, along with the time specifically spent reviewing the plaintiff's medical records. Under the particular circumstances of that case, the court believed that an award of fees was appropriate. In reaching this conclusion, the court said:

> [C]ompensating [the expert] for his time spent reviewing Plaintiff's medical records speeds the deposition process along, thereby saving on costs. The more costly alternative would be for [the expert] to refresh his memory during the deposition with the medical records. Under that scenario, not only would [the defendants] be required to pay [the expert], but [they] would be required to absorb the addition-

al costs of their counsel while [the expert] refreshed his memory.

154 F.R.D. at 228.

We decline to hold, as requested by D & D, that an expert can never, *as a matter of law,* recover under Rule 2–402(e)(3) for time spent preparing for a deposition. The trial court has the power to require the discovering party to pay for the expert's preparation time when the circumstances so require. As such requests can be easily abused, however, awards for preparation time should be granted only in extraordinary situations. *See Beery,* 89 Md.App. at 102, 597 A.2d 516 ("A *post facto* arbitrary apportionment of generalized time records will not suffice."). But the potential for abuse does not, by itself, preclude such an award. *See, e.g., Major,* 97 Md.App. 520, 631 A.2d 127 (court may determine the amount of an attorney's fees award under Md.Rule 1–341 based on affidavit of attorney); *U.S. Health, Inc. v. State,* 87 Md.App. 116, 131, 589 A.2d 485, *cert. denied,* 324 Md. 69, 595 A.2d 482 (1991) (salaried in-house attorney is not entitled to an award representing market rates, even though precise calculation of attorney's actual expenses is extremely complicated). We see no basis for concluding that such compensation is inherently beyond the scope of Rule 2–402(e)(3).

**ORDERS OF SEPTEMBER 15, 1994 AWARDING EXPERT WITNESS FEES VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY AMONG APPELLANTS AND APPELLEES.**